## CROUCH v. MEYER et al.

*(Supreme Court, Special Term, Monroe County.   March 14, 1892.)*

SPECIFIC PERFORMANCE—RELEASE OF MORTGAGED PREMISES—FRAUD.

Where a mortgagor seeks specific performance of a provision in the mortgage, whereby certain parts of the mortgaged premises were to be released from time to time as payments were made, and the evidence shows that there was no absolute agreement for such a release, but that it was put into the mortgage in the absence of the mortgagees, after they had examined it with the help of counsel and expressed themselves as satisfied, it is incumbent on the mortgagor, upon a denial by the mortgagees of any knowledge of such provision, to show, at least, what was said by the mortgagees in the conversation which it was claimed resulted in their acceptance of the provision, and to show also that the provision itself was thoroughly understood.

Action by George W. Crouch, Jr., against William T. Meyer and Sophia Meyer to compel specific performance of a contract to release part of mortgaged premises.   Dismissed.

*C. F. Dean* and *W. E. Edmunds,* for plaintiff.   *Jacob Spahn,* for defendants.

RUMSEY, J.   In November, 1889, the defendants sold to the plaintiff a parcel of land near Rochester.   To secure a part of the purchase price, the plaintiff gave to the defendants a mortgage for $2,500, conditioned to pay that sum in six years, with semi-annual interest at 5 per cent., with the privilege to the plaintiff to pay the whole or any part of the sum at any time. When the mortgage was finally delivered to defendants, it also contained the following provision: "And the parties of the second part, or the survivor, hereby agrees to release from the lien of this mortgage one acre of ground for every $500 paid hereon, and in that proportion for greater or less payments."   The plaintiff, after he had bought the lands, laid them out into lots, and opened streets through the tract, and proceeded to sell the lots.   In April, 1890, he sold one lot to one Zoneville.   That lot contained 3,873 square feet, and the sum requisite to procure a release of it under the terms of the provision quoted above is $45.63; that sum the plaintiff tendered to defendants and demanded a release of the lot, which the defendants refused to give; and the plaintiff brings this suit to compel them to give such release.   The defendants insist that they never acceded to the agreement quoted above, and did not know that it was in the mortgage when they accepted it.   All parties agree that when the sale was first agreed upon the only talk about the mortgage was that it was to run for six years, at 5 per cent.   The defendants so testified, and the plaintiff, upon being recalled, swore that defendants said: "All they wanted was the interest on this mortgage.   Bought it on six years' time, and semi-annual interest at five per cent."   In his version of the way in which the clause in question came to be in the mortgage, the plaintiff, in response to the very suggestive questions of his own counsel, gave the following: "*Question.* What instructions did you give Dean in reference to drawing this bond and mortgage?   *Answer.* I gave him the instructions to draw them as the bond and mortgage are drawn now.   *Q.* In just the same terms and conditions?   *A.* Yes, sir.   *Q.* Were those terms and conditions talked over there in Dean's office, on the 23d of November?   *A.* Yes, sir. *Q.* When both of these parties were present?   *A.* Yes, sir.   *Q.* And they understood it at the time?   *A.* Yes, sir.   *Q.* Did you say anything to them about what purpose you were buying this land for?   *A.* No."   As both defendants had testified that there was no arrangement for release, it would have been much more satisfactory if the plaintiff, instead of being plied by his own counsel with leading questions to obtain an inferential contradiction, had been permitted to tell just what was said.   As it is, he does not say that the defendants agreed to the clause consenting to release part of the

premises. He says it was talked over, and they understood it, and he told Dean to put in. Not one word is said from which it can be inferred that they assented to it. The defendants say that on the 23d of November they went to Dean's office, and talked the matter over, and took the mortgage to Rau, and had it read over. They say that was on Saturday, which is the fact. They say that they then took it to Dean, who told them it was too late to get it recorded, and that Mrs. Crouch had not signed it, and to leave it, which they did, until Tuesday, the 26th, when they got it, and put it on record. They say, and Dean corroborates them, that when they took the mortgage to Rau to read there was nothing in it about releasing on payment of $500 an acre. Dean was asked: "*Question.* Will you swear it [the provision for a release] was in there when this mortgage went to Rau? *Answer.* That I don't know."

That being the state of the evidence, the testimony of Dean as to the way he came to put the provision for a release into the mortgage is instructive. The following is the testimony: "*Question.* How long did the mortgage stay in an unfinished condition? *Answer.* They didn't seem to have come together at first, and beyond the dates I don't know. *Q.* You don't know how long it was unfinished? *A.* I think they was in there. They had talks, or were having different talks, between themselves. * * * *Q.* Why was it kept unfinished,—because they didn't agree upon their bargain? *A.* That is as I understood it. *Q.* How did you know it when they finally agreed? *A.* Mr. Crouch told me that was all he wanted in the mortgage. *Q.* Who was present when he told you that? *A.* I don't know. It was my impression they were there, and things of that kind were suggested—talked over—when we were all there, and that this thing was mentioned, or something similar to it, because he was plotting this property, and that he came in there afterwards, and said he wanted that clause in. *Q.* Who did? *A.* Crouch. *Q.* That was put in at some time, in pursuance of a suggestion of his when they were not there? *A.* No; a suggestion made when they were there, but it was put in when they were not there afterwards. *Q.* You were not yourself cognizant of the agreement to have that put in, but you took it from what Mr. Crouch said? *A.* No; my recollection is that these things were suggested in a conversation when they were all in the office, and that afterwards Crouch came in, and ordered it put in,—put in a clause of that nature. *Q.* You say they were suggested when they were there. Do you mean by that it was agreed when they were there? *A.* I can't say there was an absolute agreement to that extent. Crouch seemed to have his mind made up, what he wanted, and Meyer and those did not see to,—they were groping along."

It will be noticed that neither Dean nor Crouch give one word of conversation which resulted in getting into the mortgage this remarkable agreement. It was not there when defendants' friend read the mortgage. There was not "an absolute agreement" to put it in. So much the counsel for plaintiff admits. Now, when the facts are that there was no agreement for such a release, and it was put into the mortgage by direction of the mortgagor, in the absence of the mortgagees, and after they had examined the mortgage with the help of their counsel, and expressed themselves as satisfied with it, if the defendants deny any knowledge of such an agreement it lies upon the plaintiff to show, at least, what the defendants said by way of acceding to it. But nothing of the kind is done. The plaintiff was bound to show, too, that this new agreement thus put in, in the absence of defendants, was thoroughly understood by them before they accepted it. Mr. Dean swears that he read and explained it to them when he gave them the mortgage, and that Meyer said he was satisfied. But Meyer and his wife both say that they did not un-. stand that anything of the sort was in the mortgage when they took it. They both appeared like honest people, and I think they told the truth. Now, here we have a case, where, by the concession of the man who drew the mortgage,

something very important was put into it, which had not been "absolutely agreed" to, at a time when the mortgagees were absent; and these mortgagees, too, were ignorant people, who could not read the language in which the mortgage was written. The mortgage was drawn by the attorney for the mortgagor, and the agreement in question was one which was greatly for his benefit, and greatly to the disadvantage of the mortgagees, in its probable effect on the mortgage as a security. It is undeniable, as a matter of fact, that the mortgagees did not understand the nature of the agreement which was put upon them.

Can the plaintiff and mortgagor have specific performance of such an agreement? It is well settled that a judgment for specific performance of a contract is in the sound discretion of the court, and that it will not be adjudged in any case where there are shown to be in the contract, or the making of it, any elements of mistake which would render such a judgment inequitable. *Margraf* v. *Muir*, 57 N. Y. 155; *Patterson* v. *Bloomer*, 35 Conn. 57. It is not necessary that the defendant should show that the agreement was so tainted with fraud as that it should be given up to be canceled to require the court to refuse specific performance. It will not be decreed unless it appears that the agreement has been entered into with perfect fairness, and without misapprehension or misrepresentation. *Frisby* v. *Ballance*, 4 Scam. 287; 3 Pom. Eq. Jur. § 1405. The rule, as laid down by Mr. Pomeroy in another place, is that whenever the defendant's mistake was, either intentionally or not, induced or made probable or even possible by the acts or omissions of the plaintiff, then, on the plainest principles of justice, such error prevents a specific performance of the agreement. 2 Pom. Eq. Jur. § 860. It is not necessary in this case to state the rule so broadly. The case of *Malins* v. *Freeman*, 2 Keen, 25, cited by Mr. Pomeroy, amply sustains him. In that case Malins and Davies had employed the same auctioneer to sell for them, at the same place and on the same day, several separate pieces of real estate. Davies had employed Freeman to bid for him on some of the property. Freeman, by mistake, for which he alone was responsible, bid off property of Malins', supposing he was buying in land of Davies under his employment. Upon suit by Malins for specific performance, the master of the rolls (Lord LANGDALE) refused to decree it, saying that the question was whether, if the mistake be proved, the court would enforce specific performance. He concluded that in such a case specific performance ought not to be decreed. In *Denny* v. *Hancock*, L. R. 6 Ch. App. 1, the defendant had bought property under a mistake as to its boundaries for which the plaintiff was responsible, although without fraud; and the justices of appeal held, reversing the vice-chancellor, that because of that mistake specific performance should not be decreed at the suit of the vendor. Many other cases are cited in the text-books to the same effect. In this case the defendants were by mistake led to accepting a mortgage containing an agreement of which they had no knowledge. That mistake was clearly brought about by the act of the plaintiff and of his attorney. It is unnecessary to charge either of them with fraud. It is sufficient to say that they permitted the defendants to be misled, so far as to apparently become parties to a contract of which they had no sufficient information. The well-settled policy of the law requires that specific performance of such a contract should not be adjudged, but that the complaint should be dismissed.